UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

JON BAUMGARDNER,          :

            Plaintiff          :    No. 4:CV-10-1459

vs.                       :    (Judge Nealon)

DAVID J. EBBERT, et al.,       :

         Defendants       :

FILED
SCRANTON

MAR 2 0 2013

PER _____
DEPUTY CLERK

## MEMORANDUM

Plaintiff, Jon Baumgardner, an inmate confined in the Federal Correctional Institution,

Allenwood, Pennsylvania ("FCI-Allenwood"), filed the above captioned Bivens[1] action on July

15, 2010. Defendants are the following FCI-Allenwood Federal Bureau of Prison's Medical

Health Service and Staff Employees: David J. Ebbert, Warden; Jeffrey Raleigh, former

Associate Warden; Jay Miller, Medical Officer; Ronald Laino, Health Services Administrator

("HSA"); Jeremy Simonson, Medical Officer; Debra Spotts, former Assistant Health Services

Administrator ("AHSA"); and Michaeleen Powanda, Physician's Assistant ("PA"). Also named

as a Defendant is Dr. David J. Ball, a private orthopedic surgeon.

By Memorandum and Order dated September 20, 2011, Defendants' motion to dismiss

was granted in part, in that Defendants Ebbert, Riley, Laino, and Simonson were dismissed from

the instant action, and the claims pre-dating July 2008 against Defendant Ball were dismissed.

(Doc. 30, Memorandum and Order). Defendants' motion to dismiss Plaintiff's Eighth

_____

1. Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 397 (1971).

Amendment deliberate indifference claims as to Defendants Ball, Miller, Spotts, and Powanda was denied, and Plaintiff was permitted to file an amended complaint. Id.

On September 29, 2011, Baumgardner filed an untitled document which was later determined to be his amended complaint. (Doc. 32). Believing that no amended complaint had yet been filed, Defendants filed Answers to Baumgardner's original complaint. See (Docs. 33, 34).

On December 22, 2011, Government Defendants filed a motion to dismiss the Amended Complaint, (Doc. 37), as well as a brief in support of the motion. (Doc. 38). Baumgardner filed a brief in opposition to Defendants' Motion to Dismiss on January 5, 2012. (Doc. 39). Defendants filed a reply brief on January 20, 2012. (Doc. 40).

On February 11, 2012, Attorney Larrick Stapleton entered his appearance on behalf of Baumgardner and moved the Court for leave to file a second amended complaint and for an enlargement of time to respond to Defendants' pending dispositive motion. (Doc. 45).

On February 17, 2012, Baumgardner's counsel filed a proposed second amended complaint. (Doc. 46). On March 13, 2012, the Court granted Baumgardner leave to file an amended complaint and accepted the Second Amended Complaint as filed. (Doc. 47). Additionally, the Court dismissed the pending dispositive motion as moot. Id.

The Second Amended Complaint names as Defendants all of the Defendants who were named in Baumgardner's original complaint, many of whom were previously dismissed from the case, plus unidentified Defendants BOP Officer John Doe and BOP Officer Richard Roe[2], and

---

2. To date, neither the John Doe, nor Richard Roe Defendants have been specifically identified or served, and no attorney has entered an appearance on behalf of any of these Defendants.

the Federal Bureau of Prisons ("BOP"). (Doc. 46, Second Amended Complaint). In addition to the Bivens allegations against the individual Defendants, the Second Amended Complaint raises new claims against the United States pursuant to the Federal Tort Claims Act, pursuant to 28 U.S.C. § 2671, et seq., and additional new claims pursuant to the Americans With Disabilities Act, 42 U.S.C. § 12132. Id.

Presently before the Court is Government Defendants' motion to dismiss and motion for summary judgment, (Doc. 57), and Defendant Ball's motion to dismiss, and motion to dismiss for failure to file a certificate of merit. (Docs. 50, 60). The motions are fully briefed and are ripe for disposition. For the reasons that follow, the Court will grant Defendants' motions to dismiss and for summary judgment.

## I.     Standards of Review

### A. Bivens Standard

Plaintiff's claims are filed pursuant to 28 U.S.C. § 1331, in accordance with Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. 388, (1971). Under Bivens, the District Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 to entertain an action brought to redress alleged federal constitutional or statutory violations by a federal actor. Id. Pursuant to Bivens, "a citizen suffering a compensable injury to a constitutionally protected interest could invoke the general federal question jurisdiction of the district court to obtain an award of monetary damages against the responsible federal official." Butz v. Economou, 438 U.S. 478, 504 (1978). A Bivens-style civil rights claim is the federal equivalent of an action brought pursuant to 42 U.S.C. § 1983 and the same legal principles have been held to apply. See Paton v. LaPrade, 524 F.2d 862, 871 (3d Cir. 1975); Veteto v. Miller,

3

829 F. Supp. 1486, 1492 (M.D. Pa. 1992); Young v. Keohane, 809 F. Supp. 1185, 1200 n.16 (M.D. Pa. 1992). In order to state an actionable Bivens claim, a plaintiff must allege that a person has deprived him of a federal right, and that the person who caused the deprivation acted under color of federal law. See West v. Atkins, 487 U.S. 42, 48 (1988); Young v. Keohane, 809 F. Supp. 1185, 1199 (M.D. Pa. 1992); Sharpe v. Costello, 2007 WL 1098964, *3 (M.D. Pa. 2007).

### B. Summary Judgment

Federal Rule of Civil Procedure 56(c) requires the court to render summary judgment "...forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. Anderson, 477 U.S. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson, 477 U.S. at 257; Brenner v. Local 514, United Brotherhood of Carpenters and Joiners of America, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. Moore v. Tartler, 986 F.2d 682 (3d Cir. 1993); Clement v. Consolidated Rail Corporation, 963 F.2d 599, 600 (3d Cir. 1992); White v. Westinghouse Electric Company, 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. When the party seeking summary judgment satisfies its burden under Rule 56(c) of identifying evidence which demonstrates the absence of a genuine issue of material fact, the nonmoving party is required by Rule 56(e) to go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. Celotex Corporation v. Catrett, 477 U.S. 317, 324 (1986). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industrial Co. v. Zenith Radio, 475 U.S. 574, 586 (1986). When Rule 56(e) shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323. See Harter v. G.A.F. Corp., 967 F.2d 846, 851 (3d Cir. 1992).

**C. Motion to Dismiss**

The Court in Williams v. Hull, 2009 WL 1586832, *2-*3 (W.D. Pa. 2009), set forth the Motion to Dismiss standard of review, as annunciated by the Supreme Court in Bell Atlantic

Corp. v. Twombly, 550 U.S. 544, (2007), and as refined in Ashcroft v. Iqbal, 556 U.S. 662, 129

S. Ct. 1937, 173 L. Ed. 2d 868 (2009), as follows:

> The issue is not whether the plaintiff will prevail at the end but only whether he should be entitled to offer evidence to support his claim. Neitzke; Scheuer v. Rhodes, 419 U.S. 232 (1974). A complaint must be dismissed pursuant to Rule 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (rejecting the traditional 12(b)(6) standard set forth in Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). See also Ashcroft v. Iqbal, ---U.S. ----, ----, 129 S.Ct. 1937, ----, 173 L.Ed.2d 868, ----, 2009 WL 1361536 (May 18, 2009) (specifically applying Twombly analysis beyond the context of the Sherman Act). The court must accept as true all allegations of the complaint and all reasonable factual inferences must be viewed in the light most favorable to plaintiff. Angelastro v. Prudential-Bache Securities, Inc., 764 F.2d 939, 944 (3d Cir.1985). The Court, however, need not accept inferences drawn by plaintiff if they are unsupported by the facts as set forth in the complaint. See California Pub. Employee Ret. Sys. v. The Chubb Corp., 394 F.3d 126, 143 (3d Cir.2004) citing Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir.1997). Nor must the court accept legal conclusions set forth as factual allegations. Twombly, 550 U.S. at 556, citing Papasan v. Allain, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 556. Although the United States Supreme Court does "not require heightened fact pleading of specifics, [the Court does require] enough facts to state a claim to relief that is plausible on its face." Id. at 570.
>
> In other words, at the motion to dismiss stage, a plaintiff is "required to make a 'showing' rather than a blanket assertion of an entitlement to relief." Smith v. Sullivan, 2008 WL 482469, at *1 (D. Del. February 22, 2008) quoting Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir.2008). "This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." Phillips, 515 F.3d at 232, quoting Twombly, 550 U.S. at 556 n. 3.

II.  **Statement of Facts**

From the pleadings, declarations and exhibits submitted therewith, the following facts

can be ascertained as undisputed.

6

On June 3, 2008, Plaintiff ruptured his right Achilles tendon while playing basketball in the outside recreation yard. (Doc. 66-2, Att. 2, Medical Record at 20, Health Services Clinical Encounter). Plaintiff was immediately taken to the medical department, where he was seen and treated by Nurse Shoemaker. Id. Nurse Shoemaker wrapped Plaintiff's foot with an ace bandage, gave him crutches to use, and instructed him to keep the foot elevated, apply ice and return to sick call in the morning. Id.

On June 4, 2008, Plaintiff returned to the medical department, where he was examined by nurse practitioner, Kathleen Cost. (Doc. 66-2, Att. 2, Medical Record at 21-22. Health Services Clinical Encounter). An x-ray of his foot was taken, Ibuprofen was prescribed, and an Orthopedic consult for surgery was ordered. Id.

On June 6, 2008, surgery to repair Plaintiff's Achilles tendon was performed by Dr. Ball, an outside orthopedic surgeon. (Doc. 66-2, Att. 2, Medical Record at 23-25, Health Services Clinical Encounter). Plaintiff returned from surgery with the following recommendations: (1) Tylenol #3; (2) Keflex, 500 mg for ten days; (3) no weight bearing on the right leg; (4) ice right ankle; (5) see Dr. Ball in clinic in June; and (6) do not remove skin clips until Monday, June 23. Id.

On June 17, 2008, Plaintiff was again seen by Dr. Ball. (Doc. 66-2, Medical Record at 26-27, Examination Report). Dr. Ball made the following findings:

> He is being evaluated for his right ankle. He underwent right Achilles tendon repair 10 days ago.
>
> EXAMINATION: His dressing and splint were removed. He was ambulating with crutches. The incision was healing quite nicely with skin clips present. There was no drainage or erythema. Thompson's test was negative.
>
> IMPRESSION: Status post right Achilles tendon repair.

> PLAN: The patient had a new dressing and splint applied. He is going to return to the orthopedic clinic next week to have his skin clips removed and then Steri-Strips will be applied. I did talk to him about his job at Unicor and I told him he could use a cane beginning 07/01/08 for one day only after which point he should use his crutches until he is reevaluated back in the clinic next month.

Id.

On June 24, 2008, Baumgardner was seen by a paramedic for removal of his staples. (Doc. 66-2, Att. 2, Medical Record at 28, Health Services Clinical Encounter). It was noted that the "staples were removed without incident" and Plaintiff was "given a cane for use after 6-30-08 when he returns to work." Id.

On July 21, 2008, Plaintiff was seen by licensed practical nurse, Debra Spotts. (Doc. 66-2, Att. 2, Medical Record at 29, Health Services Clinical Encounter). It was noted that Plaintiff was "now ambulating without assistance" but was experiencing some pain. Id. Plaintiff was prescribed 800 mg of Ibuprofen three times a day for ten days. Id.

On August 7, 2008, Baumgardner was seen by PA Powanda. (Doc. 66-2, Att. 2, Medical Record at 31-33, Health Services Clinical Encounter). He complained of a burning sensation and numbness in the foot and heel, and asked for direction in relation to rehabilitation. Id. PA Powanda, after conferring with Dr. Ball, educated Baumgardner on stretching exercises, biking, or whatever activity he may tolerate and advised him to follow-up at sick call should he have further concerns. Id. She noted that "Dr. Ball states that since the inmate is approximately 8 weeks out from surgery, he can resume all normal activities." Id. On August 19, 2008, Baumgardner was seen by Dr. Ball, treated for heel pain, and expressed concern about physical therapy. (Doc. 66-2, Medical Record at 34-36, Examination Report, Health Services Clinical Encounter). Dr. Ball noted the following:

8

He is being evaluated for his right heel. He underwent Achilles tendon repair on 06/06/08. He is currently about 10 weeks status post right Achilles tendon repair.

EXAMINATION: He was ambulating without any cane or crutches. His right heel incision was well healed. There was no drainage or erythema. He did reveal an increase with dorsi and plantar flexon strength. Hi Thompson test was negative.

PLAN: He did relate some disapproval of the fact that he did not get any physical therapy after his surgery. He apparently talked to his brother who is a nurse as well as some other people in the medical field who thought he should have been transferred to another institution for physical therapy. I did mention to him at this point, since he is 10 weeks out he should be about to continue with some range of motion and strengthening. I showed him how to do stretching by going up a step. I also told him he could use weights and a stationary bicycle for his stretching and strengthening. Since he does have some mild swelling he is now going to be started on a Medrol Dosepak for one week and he will resume the Motrin 800mg, t.i.d. In the meantime, he will continue with the range of motion and strengthening as tolerated. The patient at this point has otherwise had an excellent result with his Achilles tendon repair.

Id. Dr. Ball further stated that Plaintiff's "result is 'excellent' and that in some ways he is 'ahead of the game' having started walking on the foot early." Id. He advised Baumgardner to incorporate some stationary bike work and stretching, as well as walking and strength training. Id. For Plaintiff's complaint of heel pain when walking, Dr. Ball prescribed a steroid taper for six days. Id.

On August 31, 2008, Baumgardner was examined and treated with Ibuprofen for right Achilles pain when walking and swelling after recreation. (Doc. 66-2, Att. 2, Medical Record at 37-38, Health Services Clinical Encounter).

On September 24, 2008, he was again treated for right Achilles and hip pain. Id. at 39.

On September 30, 2008, he was again seen by Dr. Ball, who found the following:

He is being evaluated for his right heel. He underwent Achilles tendon repair about 4 months ago. He states he has been working in Unicor and at the end of

the day he gets some pain in his calf and he is now also starting to get some pain in his hip because of the way he is walking.

EXAMINATION: He was examined today. He was ambulating without any cane or crutches. He was ambulating with a slight limp. His shoes were removed. He had increase with dorsi and plantar flexion strength. There was no defect in the Achilles tendon. He had some mild tenderness in the left calf.

IMPRESSION: Status post Achilles tendon repair.

PLAN: At this point, I am going to recommend a heel pad to his right heel. I am also going to recommend Motrin 600 mg p.o. q.i.d. I have encouraged him to use a stationary bike to help increase his range of motion and strength. I also talked to him about stretching using a towel or a rope to stretch out the Achilles tendon. At this point, I am going to see him back in the orthopedic clinic on a p.r.n. basis.

(Doc. 66-2, Medical Record at 40-41, Examination Report, Health Services Clinical Encounter).

On October 3, 2008, Plaintiff was examined and treated for hip pain and tightness in his right Achilles tendon. (Doc. 66-2, Att. 2, Medical Record at 42-43, Health Services Clinical Encounter). He reported that he was doing stretching exercises, walking and using a stationary bike, and was advised to continue. Id.

On October 21, 2008, Baumgardner was treated for a friction-type open wound at the incision site. (Doc. 66-2, Att. 2, Medical Record at 44-45, Health Services Clinical Encounter). Although he stated that it "burn[ed] some", he had no pain, discharge, fever or chills. Id. The site was cleansed with betadine and covered with a large band aide. Id. Plaintiff was instructed to follow-up at sick call as needed. Id.

On November 10, 2008, Plaintiff he was treated for heel and hip pain. (Doc. 66-2, Att. 2, Medical Record at 46, Health Services Clinical Encounter). He stated that "sitting makes it worse", the heel lift he received was not working and that he would like to be reevaluated. Id. An appointment was scheduled with his primary care provider. Id.

On November 17, 2008, Plaintiff was examined and treated for continuous pain in his right heel and hip. (Doc. 66-2, Att. 2, Medical Record at 47-49, Health Services Clinical Encounter). He was advised to continue his exercises, his medications were renewed, an x-ray of the hip was ordered, and a follow-up appointment was scheduled. Id.

On November 19, 2008, Petitioner had an x-ray of his hip, which yielded negative findings. (Doc. 66-2, Att. 2, Medical Record at 50, Radiology Report).

On December 1, 2008, Baumgardner complained of hip and lower back pain and an appointment was scheduled with his primary care provider. (Doc. 66-2, Att. 2, Medical Record at 51, Health Services Clinical Encounter).

On December 10, 2008, Baumgardner was examined and treated for his continuing right hip and back pain. (Doc. 66-2, Att. 2, Medical Record at 52-55, Health Services Clinical Encounter). He was informed that the x-ray results were negative, however, further evaluation with an MRI was ordered. Id. Plaintiff was also prescribed 25 mg of Topiramate, two times a day for 180 days. Id.

On December 15, 2008, Plaintiff was seen by a paramedic for complaints of nausea, fatigue, and blurred vision, and the Topiramate was discontinued. (Doc. 66-2, Att. 2, Medical Record at 56-57, Health Services Clinical Encounter).

On December 29, 2008, he was examined and treated for his continuing hip pain. (Doc. 66-2, Att. 2, Medical Record at 58-59, Health Services Clinical Encounter).

On February 25, 2009, Plaintiff received an MRI, which yielded "some slight bilateral hip joint degenerative change is present, greater on the left than right" and "fractures or bony destructive lesions are not seen." (Doc. 66-2, Att. 2, Medical Record at 61, MRI result).

On March 19, 2009, Baumgardner was examined and treated for back and hip pain, and the results of the MRI were discussed with him, the current treatment regimen was continued, as it seemed to be helpful in management of Plaintiff's current pain, and a lumbar x-ray and labwork was ordered. (Doc. 66-2, Att. 2, Medical Record at 62-63, Health Services Clinical Encounter).

On March 23, 2009, Plaintiff had an x-ray of his lumbar spine, which yielded negative findings. (Doc. 66-2, Att. 2, Medical Record at 66, Radiology Report).

On March 30, 2009, Baumgardner reported worsening back pain, and an appointment was scheduled with his primary care provider. (Doc. 66-2, Att. 2, Medical Record at 65, Health Services Clinical Encounter). He was also informed that the x-ray results were negative. Id.

On April 20, 2009, he was examined and treated for back pain. (Doc. 66-2, Att. 2, Medical Record at 67, Health Services Clinical Encounter). The following was noted:

> Inmate presents with right lower lumbar tightness, stiffness, pain, popping and grinding that has been ongoing for the past 6 months. Within the last month these symptoms have been getting progressively worse. Indicated that he really only gets pain when his back pops back into place at night. States that it feels like there is something moving in his back and that it is getting worse. Denies loss of bowel or bladder function. His physical exam is essentially unremarkable. Had a lumbar x-ray completed recently with negative results. Was seen with Dr. Miller today who would like to get an MRI to further evaluate. Inmate is currently on valproic acid and ibuprofen for pain control (related to right hip discomfort as well) and this is helping. MRI questionnaire filled out and attached.

Id.

Another MRI was completed on June 1, 2009. (Doc. 66-2, Att. 2, Medical Record at 71, MRI Results). The MRI showed "no evidence to suggest significant disc bulge, herniation, or AP spinal canal stenosis...exit foramen appear patent." Id.

On June 22, 2009, the MRI results were discussed with Baumgardner. (Doc. 66-2, Att. 2, Medical Record at 72, Health Services Clinical Encounter). He indicated that "his lower back pain hasn't gotten any worse, it's pretty much stayed the same...the valproic acid and ibuprofen seem to be keeping the pain tolerable...states he is still having grinding and popping in lower back...only feels the pain when it pops back into place, most times just feels a tightness." Id.

On September 14, 2009, Baumgardner requested and received a refill of pain medication and an appointment with PA Powanda. (Doc. 66-2, Att. 2, Medical Record at 74-75, Health Services Clinical Encounter). He also requested "to be evaluated for a pair of orthopedic shoes or inserts to help the limp and pain in his knee/hip/lower back." Id.

Petitioner was seen by PA Powanda on September 21, 2009. (Doc. 66-2, Att. 2, Medical Record at 76-77, Health Services Clinical Encounter). He stated that he "recently bought new boots from the commissary that are helping with his right hip and lower back pain." Id. He states that he "has approximately a 2 and half inch lift with these new boots (which includes a half inch shoe insert)", and "the pain has gone down quite a bit but will come back to the full force that it was before when he switches back to his tennis shoes." Id. He further states that the "valproic acid and Motrin for pain is helping" and that he "seems to have a 2 inch discrepancy from his right foot compared with his left foot when he is stretching barefoot most likely due to his right Achilles tendon repair" and asks "if there is any way he can get a special pair of tennis shoes or inserts." Id.

On November 30, 3009, Plaintiff was seen for complaints of continuing back pain and a possible leg length discrepancy. (Doc. 66-2, Att. 2, Medical Record at 78-79, Health Services Clinical Encounter). He inquired again about a lift or special orthopedic shoes. Id. He was

informed that a request had never been submitted but that an appointment would be scheduled to discuss the issue. Id.

On December 28, 2009, he was seen for complaints of a right leg limp and of right knee, hip, and lower back pains. (Doc. 66-2, Att. 2, Medical Record at 80-82, Health Services Clinical Encounter). He reported that the pain medication provided relief, that he had occasional right Achilles pain, and that he was doing some stretching and using the Stairmaster. Id. He stated that "the shoe insert (heel pad) was given to him by health services as recommended by ortho." Id. An evaluation for his report of a leg length discrepancy was negative, and it was noted that a new pair of shoe inserts would be ordered. Id.

On January 20, 2010, Baumgardner was provided heel pads. (Doc. 66-2, Att. 2, Medical Record at 83-84, Health Services Clinical Encounter). He stated that "they were the correct ones and were like the ones that he had received previously." Id.

Approximately six months later, on June 9, 2010, Plaintiff again complained of an increasing limp and knee, hip, and back pain ever since his heel lifts had worn out. (Doc. 66-2, Att. 2, Medical Record at 85-86, Health Services Clinical Encounter). New heel lifts were ordered for him and he received them on June 15, 2010. (Doc. 66-2, Att. 2, Medical Record at 85-88, Health Services Clinical Encounter).

On July 15, 2010, Baumgardner initiated the above captioned action. (Doc. 1, complaint). In his second amended complaint, Baumgardner alleges that Defendants violated the Federal Tort Claims Act, pursuant to 28 U.S.C. § 2671, et seq., the Americans With Disabilities Act, 42 U.S.C. § 12132, and his First, Fifth, and Eighth Amendment rights under the Constitution.

14

Specifically, Baumgardner claims that Defendants knew of Baumgardner's condition and the "need and requirement for prompt treatment," but failed to timely provide such treatment, in violation of his constitutional rights. (Doc. 46, Second Amended Complaint at ¶¶ 42, 51). Baumgardner pursued all available remedies under the FTCA, but his access to "necessary outside independent medical personnel and resources or access to evaluation and scrutiny of the care that he was in fact receiving" was restricted. Id. at ¶ 54.

He alleges that medical staff was not properly trained, experienced, licensed or qualified for their positions. Id. at ¶ 55. Defendants withheld or denied "necessary or indicated treatment" to punish him or to discourage him from complaining about the treatment he was receiving and from taking legal action against them. Id. at ¶ 13. Defendants have a policy of denying or withholding"rights or privileges" from inmates who complain about the quality of their medical care. Id. at ¶ 57.

Plaintiff alleges that Warden Ebbert, administrative staff, and medical staff "engaged in and/or permitted a culture of neglect and indifference," caused or condoned the denial and withholding of needed medical care as punishment, and ignored complaints of insufficient medical care from "inmates over a period of years." Id. at ¶¶59-60.

Baumgardner generally alleges Fifth Amendment violations of intentional mistreatment; Eighth Amendment violations of cruel and unusual punishment and deliberate indifference to his medical condition; and First Amendment violations of retaliation by withholding privileges from inmates who complain. Id. at ¶¶ 61-65.

Plaintiff's claims brought pursuant to the FTCA are that Defendants failed to provide, or to timely provide, him with adequate and appropriate medical care; denied him access to outside

health care providers; failed to properly train, supervise, monitor, control or discipline medical staff; improperly represented their medical staff as properly trained and qualified medical personnel; failed to follow BOP policies and guidelines; misrepresented the "nature, level and quality of care available" to Baumgardner; and failed to implement policies regarding "individuals with disabilities and medical conditions requiring medication." Id. at ¶ 71. As a result, he suffered and continues to suffer pain and permanent disability. Id. at ¶ 72-73.

Baumgardner additionally claims that the BOP failed to properly train its medical staff; denied Baumgardner access to outside medical care providers; failed to have adequate policies regarding medical care and treatment of inmates; medical staff deviated from their duties and from standard medical practice; supervisors failed to properly monitor or evaluate medical staff; and failed to provide medical staff who was duly qualified and experienced. Id. at ¶¶ 76-93.

Baumgardner generally alleges that medical staff failed to provide adequate medical care following his Achilles tendon injury, causing him injury, pain and suffering, and permanent loss of the use of his right foot and leg. Id. at ¶¶ 98-99.

Baumgardner's claim brought pursuant to the ADA is that Defendants failed to provide him with "necessary treatments of his condition" and failed to accommodate his "severe restriction of movement." Id. at ¶¶ 101-105.

Baumgardner additionally alleges intentional infliction of emotional distress, in that Defendants withheld medical care and treatment from Baumgardner and deliberately refused to "honor and perform their responsibilities for his medical care." Id. at ¶¶ 108-110.

Baumgardner also alleges negligent infliction of emotional distress, in that Defendants violated their duty to exercise due care in treating Baumgardner by the withholding necessary

medical care and procedures by medical staff who were unqualified, causing him emotional distress. Id. at ¶ 113.

For relief, Baumgardner seeks an unspecified amount of compensatory damages, punitive damages, and attorney's fees and costs. Id. at 25, ¶¶ 1-3.

## III    DISCUSSION

### A.    Bivens Claim

### 1.    The Eighth Amendment Standard - Deliberate Indifference

In order to establish an Eighth Amendment medical claim, a plaintiff must show "(i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." Natale v. Camden Cty. Correctional Facility, 318 F.3d 575, 582 (3d Cir. 2003). See also Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999). A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that a layperson would recognize the need for a doctor's attention. Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987). In addition, "if unnecessary and wanton infliction of pain results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the eighth amendment." Id. (quotation and citation omitted).

A prison official acts with deliberate indifference to an inmate's serious medical needs when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). Thus, a complaint that a physician or a medical department "has been negligent in

diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment..." Estelle v. Gamble, 429 U.S. 97, 106 (1976). For instance, a "medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice." Id. at 107. "[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights." Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990). Further, a doctor's disagreement with the professional judgment of another doctor is not actionable under the Eighth Amendment. See White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990). In sum, negligence, unsuccessful medical treatment, or medical malpractice does not give rise to a § 1983 cause of action, and an inmate's disagreement with medical treatment is insufficient to establish deliberate indifference. See Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993).

Further, a prison administrator cannot be found deliberately indifferent under the Eighth Amendment because he or she fails to respond to the medical complaints of an inmate being treated by a prison physician, or because, as non-physicians, he or she defers to the medical judgment of the inmate's treating physicians. Id. If, however, non-medical prison personnel had "a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner," liability may be imposed. Spruill, 372 F.3d 236.

A mere difference of opinion between the prison's medical staff and the inmate regarding the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment. Farmer v. Carlson, 685 F. Supp. 1335, 1339 (M.D. Pa. 1988). See McCracken v. Jones, 562 F.2d 22, 24 (10th Cir. 1977); Smart v. Villar, 547 F.2d 112, 113 (10th

18

Cir. 1976), cert. denied, 450 U.S. 1041 (1981). Additionally, if there is a dispute over the adequacy of the received treatment, courts have consistently been reluctant to second guess the medical judgment of the attending physician. Little v. Lycoming County, 912 F. Supp. 809, 815 (M.D. Pa.), aff'd, 101 F.3d 691 (3d Cir. 1996). The key question is whether the defendant has provided the plaintiff with some type of treatment, regardless of whether it is what the plaintiff desires. Farmer v. Carlson, 685 F. Supp. at 1339.

The allegations in Plaintiff's complaint, as well as the extensive documentation of record, clearly demonstrate that Plaintiff has received medical attention for his injured Achilles tendon, as well as medical attention and accommodations for his knee, hip and back pain, which he attributes to his Achilles tendon injury, and that the attention Plaintiff received lacks the requisite deliberate indifference to support a Section 1983 claim. He does not claim that he was denied any treatment, with one exception. He alleges that he should have been provided with professional physical therapy and was not. However, the record does not evince any recommendation by any medical professional that Baumgardner should have professional physical therapy at any time after his surgery.

At best, Plaintiff's complaint demonstrates his disagreement with medical personnel concerning what treatment he should have received – whether the exercises recommended by his surgeon were sufficient, or whether he should have been treated by a professional physical therapist. Plaintiff's disagreement, however, does not serve as a predicate to liability under § 1983. See White v. Napoleon, 897 F.2d at 108-110 (3d Cir. 1990) (No deliberate indifference claim is stated when a doctor disagrees with the professional judgment of another doctor since

19

"[t]here may, for example, be several acceptable ways to treat an illness."); <u>Inmates of</u> <u>Allegheny County Jail v. Pierce</u>, 612 F.2d 754, 762 (3d Cir. 1979) (concluding that a claim for deliberate indifference does not arise just because one doctor disagrees with the diagnosis of another). This is particularly so in light of the fact that there is no evidence of record that any Defendant intentionally withheld medical treatment from Plaintiff in order to inflict pain or harm upon Plaintiff. <u>Farmer</u>, 685 F. Supp. at 1339; <u>Rouse</u>, 182 F.3d 192. Thus, Plaintiff's complaint amounts to nothing more than his subjective disagreement with the treatment decisions and medical judgment of the medical staff at the prison.

While Baumgardner is not in agreement with the medical decisions made, he was accorded continual medical care. Staff treated and evaluated Baumgardner on every visit and requested that he sign up for sick call when needed. Accordingly, Plaintiff has failed to present evidence from which a reasonable jury could conclude that Defendants possessed the culpable mental state necessary for Eighth Amendment liability to attach. <u>See Estelle</u>, 429 U.S. at 106; <u>Monmouth County Correctional Institution Inmates</u>, 834 F.2d at 346; <u>West</u>, 571 F.2d at 161. Indeed, the extent and quality of medical attention that Defendants provided Plaintiff precludes a finding of deliberate indifference.

### 2. **Respondeat Superior**

It is well-established that non-medical correctional staff may not be "considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor." <u>Durmer v. O'Carroll</u>, 991

F.2d 64, 69 (3d Cir. 1993). The rationale for this rule has been aptly explained by the United

States Court of Appeals for the Third Circuit in the following terms:

> If a prisoner is under the care of medical experts. . . , a non-medical prison
> official will generally be justified in believing that the prisoner is in capable
> hands. This follows naturally from the division of labor within a prison. Inmate
> health and safety is promoted by dividing responsibility for various aspects of
> inmate life among guards, administrators, physicians, and so on. Holding a
> non-medical prison official liable in a case where a prisoner was under a
> physician's care would strain this division of labor. Moreover, under such a
> regime, non-medical officials could even have a perverse incentive not to
> delegate treatment responsibility to the very physicians most likely to be able to
> help prisoners, for fear of vicarious liability. Accordingly, we conclude that,
> absent a reason to believe (or actual knowledge) that prison doctors or their
> assistants are mistreating (or not treating) a prisoner, a non-medical prison
> official ... will not be chargeable with the Eighth Amendment scienter
> requirement of deliberate indifference

Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004). Applying this standard, courts have

repeatedly held that, absent some reason to believe that prison medical staff are mistreating

prisoners, non-medical corrections staff who refer inmate medical complaints to physicians may

not be held personally liable for medically-based Eighth Amendment claims. See e.g., Johnson

v. Doughty, 433 F.3d 1001 (7th Cir. 2006); Spruill, 372 F.3d 218; Durmer, 991 F.2d 64; Garvey

v. Martinez, 2010 WL 569852 (M.D. Pa. 2010); Hodge v. United States, 2007 WL 2571938

(M.D. Pa. 2007).

Moreover, a claim of a constitutional deprivation cannot be premised merely on the fact

that the named defendant was the prison warden, or a prison supervisor, when the incidents set

forth in the complaint occurred. Quite the contrary, to state a constitutional tort claim the

plaintiff must show that the supervisory defendants actively deprived him of a right secured by

the Constitution. Morse v. Lower Merion School Dist., 132 F.3d 902 (3d Cir. 1997); see also

Maine v. Thiboutot, 448 U.S. 1 (1980). Constitutional tort liability is personal in nature and can only follow personal involvement in the alleged wrongful conduct shown through specific allegations of personal direction or of actual knowledge and acquiescence in the challenged practice. Robinson v. City of Pittsburgh, 120 F.3d 1286 (3d Cir. 1997).

> In particular, with respect to prison supervisors it is well-established that:

> "A[n individual government] defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of respondeat superior. Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir.1988).

Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005). As the Supreme Court has observed:

> Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior.... See Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (finding no vicarious liability for a municipal "person" under 42 U.S.C. § 1983); see also Dunlop v. Munroe, 7 Cranch 242, 269, 3 L.Ed. 329 (1812) (a federal official's liability "will only result from his own neglect in not properly superintending the discharge" of his subordinates' duties); Robertson v. Sichel, 127 U.S. 507, 515–516, 8 S.Ct. 1286, 3 L.Ed. 203 (1888) ("A public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed by or under him, in the discharge of his official duties"). Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution

Ashcroft, 556 U.S. at 675.

Applying these constitutional benchmarks, it is apparent that, with respect to the non-medical corrections staff, Warden Ebbert and Assistant Warden Riley, as well as the supervisory medical Defendants, Defendants Laino and Simonson, Plaintiff's complaint fails to state a claim upon which relief can be granted. Plaintiff's complaint is in essence nothing more than an

assertion of <u>respondeat superior</u> liability which seeks to hold these officials liable because they supervised others. This ground of supervisory liability has been expressly rejected by the courts. Moreover, as to the non-medical corrections Defendants, Ebbert and Riley, these officials may appropriately defer to the judgment of medical professionals with respect to the care and treatment of an inmate and may not be held personally liable for that care. Accordingly, Defendants Ebbert, Riley, Laino, and Simonson are entitled to judgment as a matter of law.

### 3. **Retaliation Claim**

Although Plaintiff vaguely alleges that Defendants withheld or denied necessary or indicated treatment as a form of punishment and/or as an attempted means of minimizing and discouraging complaints about inadequate medical treatment in an effort to discourage inmates including Plaintiff from taking legal action against them, he does not provide any factual matter to support his conclusory allegations of retaliation, and thus failed to move these claims "across the line from conceivable to plausible." <u>Iqbal</u>, 556 U.S. at 681 (citing <u>Twombly</u>, 550 U.S. at 570). This Court is left with insufficient "factual content that [would allow] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id</u>. at 663 (citing <u>Twombly</u>, 550 U.S. at 570). However, in considering whether the Court should allow Baumgardner to amend his retaliation claim, the Court notes that Baumgardner is not entitled to another opportunity to amend. By Order dated September 20, 2011, Plaintiff was permitted to file an amended complaint, which he did on October 4, 2011. Plaintiff then filed a second, counseled, amended complaint on February 17, 2012. Thus, despite several opportunities to do so, Plaintiff has failed to articulate throughout the proceedings the substance of any proffered

23

amendments to his retaliation claims. There is no reason to believe that given another opportunity to amend, he can make averments sufficient to nudge his claims across the line from conceivable to plausible. Consequently, further amendment would be futile. See Phillips v. County of Allegheny, 515 F.3d 224, 245 (3d Cir. 2008).

## B. FTCA Claim

Baumgardner asserts a claim under the FTCA that BOP medical staff failed to provide, or to timely provide, him with access to a specific type of physical therapy conducted by an outside professional physical therapist.

In the instant motions, Defendants assert that Baumgardner's FTCA claims should be dismissed because he failed to file a certificate of merit ("COM"). See (Docs. 61, 66). Pennsylvania Rule of Civil Procedure 1042.3 requires that a plaintiff file a COM from a medical expert with respect to a professional negligence claim against the United States.[3]

In Boyd v. U.S., 2006 WL 2828843, * 6 (M.D. Pa. 2006) (Vanaskie, J.), this Court stated that "[Pa.] Rule 1042.3 is indeed applicable to state law malpractice claims brought in federal court." Rule 1042.3 applies when federal courts are addressing state law professional negligence claims in both diversity and supplemental jurisdiction cases. See id. at *5. The Boyd Court also stated:

---

3. A COM must be filed for a Pennsylvania State professional negligence claim or the claim will be dismissed. Velazquez v. UPMC Bedford Memorial Hospital, 328 F.Supp.2d 549, 558 (W.D. Pa. 2004). This Court has found that the COM requirement of Rule 1042.3 applies to cases filed in federal court, and also that it applies to incarcerated and pro se plaintiffs like Baumgardner. See Perez v. Griffin, 2008 WL 2383072, * 3 (M.D. Pa. 2008) (Conner, J.), aff'd., 304 Fed. Appx. 72 (3d Cir. 2008).

> Under Pennsylvania law, a party filing a professional liability claim must file a certificate of merit in which a professional licensed in the same field supplies a written statement that a reasonable probability exists that the actions of the defendant fell outside acceptable professional standards and that the actions were the cause of harm suffered by the plaintiff. See Pa. R.C. P. 1042.3(a)(1). If a Plaintiff fails to file the required certificate within sixty (60) days of filing the complaint, Defendants may file a praecipe for entry of a judgment of non pros. See Pa. R.C.P. 1042.6

Id.; See also Santee v. United States, 2008 WL 4426060 (M.D. Pa. 2008) (Nealon, J.); Lopez v. Brady, 2008 WL 4415585 (M.D. Pa. 2008) (McClure, J.).

The Third Circuit Court of Appeals has affirmed this Court's finding that the COM requirement is a substantive rule of state law that applies in federal court actions. Perez, 304 Fed. Appx. at 74 (holding that Rule 1042.3 is a substantive state law that federal district courts must apply).

In the instant case, Baumgardner was required to file a COM producing expert testimony that his medical treatment deviated from acceptable medical standards, and to show that the deviation was the proximate cause of his alleged injuries. Baumgardner filed his Complaint on July 15, 2010. (Doc. 1, complaint). Therefore, on or before September 13, 2010, he was required to file a COM. The undisputed record reflects that Baumgardner neither filed a COM nor requested an extension of time in which to do so.

Pursuant to the Third Circuit's recent holding in Perez, unless Baumgardner can show a reasonable explanation or legitimate excuse for his failure to timely file a COM, his FTCA medical malpractice claim is subject to dismissal without prejudice. In Perez, the Court observed that "failure to comply with Rule 1042.3 is not fatal to claims of professional liability if the Plaintiff can show 'reasonable excuse' for the noncompliance." Perez, 304 Fed. Appx. at

74 (quoting Womer v. Hilliker, 908 A.2d 269, 279-80 (Pa. 2006)). "Under Pennsylvania law, a court may consider two equitable exceptions when a plaintiff has improperly failed to file a COM: whether the plaintiff has substantially complied with Rule 1042.3 and whether the plaintiff has offered a reasonable explanation or legitimate excuse for failure to comply." Ramos v. Quien, 631 F. Supp. 2d 601, 611 (E.D. Pa. 2008) (citing Womer, 908 A.2d at 276, 279).

In the instant case, Baumgardner has failed to present a "reasonable explanation or legitimate excuse for non-compliance" with the COM requirement. In response to Defendants motions, Baumgardner argues that his medical claims are of ordinary negligence, rather than professional negligence; i.e., "that bare failure to pursue known necessary and routine forms of therapy were simply ignored or denied for no known reason." See (Doc. 73, Plaintiff's Brief in opposition at 29). He alleges that "the denied forms of therapy were such that they would have been known to and obvious to even lay health care workers in the prison system." Id.

In Grundowski v. United States, 2012 WL 1721781 (M.D. Pa. 2012) (Caputo, J.), the Court set forth the proper inquiry courts should make when determining whether a claim is one of ordinary negligence, rather than medical malpractice, as follows:

> In conducting this inquiry, "a court must ask two fundamental questions in determining whether a claim sounds in ordinary negligence or medical malpractice: (1) whether the claim pertains to an action that occurred within the course of a professional relationship; and (2) whether the claim raises questions of medical judgment beyond the realm of common knowledge and experience.". . . When evidence is predicated "upon facts constituting medical treatment . . . involv[ing] diagnosis, care, and treatment by licensed professionals," the evidence "must be characterized as [evidence of] professional negligence." . . . As noted by the Third Circuit, "a complaint 'sounds in malpractice' where 'the

26

conduct at issue constituted an integral part of the process of rendering medical treatment.' "

Id. at *6 (citations omitted). Applying this inquiry to the instant case, Baumgardner's claim is that his medical care providers failed to order the type of physical therapy he believed he should have at the time he believed was appropriate. This is clearly "an integral part of the process of rendering medical treatment" which involves professional medical judgment which is beyond the realm of the lay person. It cannot be said that a decision of whether, when or what type of physical therapy should be provided after surgery "is so simple or the lack of skill or care is so obvious as to be within the range of experience and comprehension of even non-professional persons." Hightower-Warren v. Silk, 698 A.2d 52, 54 n.1 (Pa. 1997). Accordingly, a certificate of merit is required for this professional negligence FTCA claim.

Moreover, with respect to Baumgardner's argument that to require a certificate of merit at this stage of the litigation of this case imposes "impossible and insurmountable burdens" because prisoners do not have access to their medical records and files prior to discovery and have no access to medical consultants, and cannot obtain private examinations without leave of court, (Doc. 73 at 30), the Court notes that Baumgardner is not proceeding pro se in this matter; he is represented by counsel. Baumgardner does have access to his own medical records, and his counsel has not, to date, made any discovery requests seeking Baumgardner's medical records. Consequently, Baumgardner's FTCA claims will be dismissed for failure to file a COM.

## C. **ADA Claim**

Plaintiff also alleges a violation of his rights under the American with Disabilities Act of

1990 ("ADA"), 42 U.S.C. § 12132. Under Title II of the ADA, "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. In order to establish a violation under Title II, a plaintiff must demonstrate: (1) that he is a qualified individual; (2) with a disability; and (3) that he was denied the opportunity to participate in or benefit from the services, programs, or activities of a public entity, or was otherwise subject to discrimination by that entity; (4) by reason of his disability. Bowers v. National Collegiate Athletic Ass'n, 475 F.3d 524, 553 n.32 (3d Cir. 2007). Individual defendants, however, are not public entities within the meaning of Title II of the ADA and are, therefore, not subject to suit. Emerson v. Thiel College, 296 F.3d 184, 189 (3d Cir. 2002) (Individuals are not subject to liability under "Titles I or II of the ADA, which prohibit discrimination by employers and public entities respectively."); Wesley v. Vaughn, 2003 U.S. Dist. LEXIS 4434 (E.D. Pa. 2003) (Prison supervisors could not be made defendants in their individual capacities in a lawsuit in which plaintiff, a prisoner, alleged the individuals failed to accommodate plaintiff's need to avoid second hand smoke.). Moreover, Baumgardner does not develop this argument further; nor does he allege any facts that might support a claim under any section of the ADA. Based on Plaintiff's failure to assert the requisite elements of a cause of action under the ADA, the claim is dismissed.

**D.** **Intentional Infliction of Emotional Distress**

In Pennsylvania, "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional

28

distress, and if bodily harm to the other results from it, for such bodily harm." Taylor v. Albert Einstein Med. Ctr., 562 Pa. 176, 754 A.2d 650, 652 (Pa. 2000). Such tortious conduct "'must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'" Hoy v. Angelone, 720 A.2d 745, 753 (Pa. 1998) (quoting Buczek v. First National Bank of Mifflintown, 531 A.2d 1122, 1125 (Pa. Super. 1987)). Under this standard, "[i]t has not been enough that the defendant has acted with an intent which is tortuous or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." Daughen v. Fox, 539 A.2d 858, 861 (Pa. Super. 1988) (quoting Restatement (Second) of Torts § 46(1) (1965), Comment(d)).

In this case, Baumgardner has not stated these required elements. First, he does not allege that any government employee acted intentionally. Baumgardner has not alleged anything close to the extreme and outrageous conduct that would give rise to a claim for intentional infliction of emotional distress. See e.g., Hoy, 720 A.2d at 754 (collecting cases); Johnson v. Caparelli, 625 A.2d 668, 672 (Pa. Super. Ct. 1993) (regarding a priest's sexual abuse of alter boy); Field v. Philadelphia Elec. Co., 565 A.2d 1170, 1183–84 (Pa. Super. Ct. 1989) (discussing claim that the defendant deliberately vented highly radioactive steam on the plaintiff and attempted to conceal overexposure to radiation). Baumgardner has not stated a claim for intentional infliction of emotional distress.

### E. Negligent Infliction of Emotional Distress

Baumgardner has also failed to state a claim for negligent infliction of emotional distress. Under Pennsylvania law, "the cause of action for negligent infliction of emotional distress is restricted to four factual scenarios: (1) situations where the defendant had a contractual or fiduciary duty toward the plaintiff; (2) the plaintiff was subjected to a physical impact; (3) the plaintiff was in a zone of danger, thereby reasonably experiencing a fear of impending physical injury; or (4) the plaintiff observed a tortious injury to a close relative." Toney v. Chester County Hosp., 961 A.2d 192, 197–98 (Pa. Super. Ct. 2008) (citing Doe v. Philadelphia Cmty. Health Alternatives AIDS Task Force, 745 A.2d 25, 26 (Pa. Super. Ct. 2000), aff'd, 767 A.2d 548 (Pa. 2001)). The facts of record in this case do not fit into of any these scenarios; therefore, Plaintiff has failed to state a negligent infliction of emotional distress claim. Plaintiff simply, generally alleges that Defendants' actions caused severe and continuing emotional distress, but does not provide any evidence to show that the decision to provide Baumgardner with one type of physical therapy as opposed to another caused him any substantial physical harm. Plaintiff's negligent infliction of emotional distress claim will be dismissed.

### F. Nonmedical negligence claims.

Baumgardner alleges that the BOP failed to properly train, supervise, monitor, control or discipline medical staff; the BOP misrepresented their medical staff as being properly trained and qualified medical personnel; failed to follow BOP policies and guidelines; misrepresented the "nature, level and quality of care available" to Baumgardner; supervisors failed to properly

monitor or evaluate medical staff; and failed to provide medical staff who was duly qualified and experienced. (Doc. 46, Second Amended complaint at SMF ¶¶ 71-76).

Absent direct involvement, a plaintiff can hold a supervisor liable for failure to train or supervise if the supervisor has shown deliberate indifference to the plight of the person involved. Carter v. City of Philadelphia, 181 F.3d 339, 357 (3d Cir. 1999). "In order for a supervisory official to be held liable for a subordinate's constitutional tort, the official must either be the moving force behind the constitutional violation or exhibit deliberate indifference to the plight of the person deprived." Pair v. Danberg, 2008 WL 4570537, *2 (D. Del. 2008) (internal quotations and citations omitted). A claim for supervisory liability or liability based upon a failure to train involves four elements: (1) existing policy created an unreasonable risk of constitutional injury; (2) the supervisor was aware of the potential for this unreasonable risk; (3) the supervisor was indifferent to the risk; and (4) the injury resulted from the policy or practice. Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989); see also Heggenmiller v. Edna Mahan Corr. Inst., 128 Fed. Appx. 240 (3d Cir. 2005) (not published).

Plaintiff's allegations include general statements that the BOP failed to property train, supervise, monitor, control, and discipline BOP medical staff. These statements are not directed towards any Defendant. It is evident in reading the complaint that plaintiff has failed to meet the pleading requirements of Twombly and Iqbal. The failure to train and supervise claim is conclusory, replete with legal buzz words, and does not identify individual Defendants. For these reasons, the Court will dismiss the failure to train and supervise claim as frivolous pursuant to pursuant to 28 U.S.C. § 1915(e)(2)(B) and § 1915A(b)(1).

## G.    **Prison Litigation Reform Act**

The Prison Litigation Reform Act provides that:

(b) Grounds for dismissal.  On review, the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint—

(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or

(2) seeks monetary relief from a defendant who is immune from such relief.

28 U.S.C.A. § 1915A.  Under Section 1915A, not only is a court permitted to <u>sua</u> <u>sponte</u> dismiss a complaint which fails to state a claim, but it is required to do so.  <u>Nieves v. Dragovich</u>, 1997 WL 698490, *8 (E.D. Pa. 1997) ("Under provisions of the Prison Litigation Reform Act codified at 28 U.S.C. §§ 1915A, 1915(e) and 42 U.S.C. § 1997e(c), the district courts are required, either on the motion of a party or sua sponte, to dismiss any claims made by an inmate that are frivolous or fail to state a claim upon which relief could be granted.").

The PLRA also amended the statutory provisions with respect to actions brought by prisoners who are proceeding <u>in forma pauperis</u>.  <u>See</u> 28 U.S.C. § 1915(e)(2).[4]  Under this provision, not only is a court permitted to <u>sua</u> <u>sponte</u> dismiss a complaint which fails to state a claim, but it is required to do so by mandatory language.  <u>See e.g.</u>, <u>Keener v. Pennsylvania Bd.</u> <u>of Probation and Parole</u>, 128 F.3d 143, 145 n. 2 (3d Cir. 1997) (describing 28 U.S.C. § 1915(e)(2)(B) as "the PLRA provision mandating <u>sua</u> <u>sponte</u> dismissal of <u>in forma pauperis</u> actions that are frivolous or fail to state a claim.").  In performing a court's mandated function of

---

4 .    Title 28 U.S.C. § 1915(e)(2) provides: "Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that— ...(B) the action or appeal—(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."

sua sponte reviewing a complaint under 28 U.S.C. § 1915(e) and under § 1915A to determine if it fails to state a claim upon which relief can be granted, a federal district court applies the same standard applied to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). See e.g., Tucker v. Angelone, 954 F.Supp. 134, 135 (E.D. Va. 1977) ("Under 28 U.S.C. §§ 1915A, 1915(e) and 42 U.S.C. § 1997e(c) the courts are directed to dismiss any claims made by inmates that 'fail to state a claim upon which relief could be granted.'").

As noted previously, unnamed Defendants John Doe and Richard Roe, have never been properly identified or served in this case, nor has either of them had an attorney enter an appearance on his or her behalf. These Defendants were named in the Second Amended Complaint that was filed on February 17, 2012. More than a year has passed since such time. As a result, these unnamed Defendants will be dismissed from this case pursuant to Rule 4(m) of the Federal Rules of Civil Procedure, as they have not been served within 120 days of the date on which they were named as Defendants in this case.

## VI. Conclusion

For the reasons stated above, the Defendants' motions to dismiss and for summary judgment, (Docs. 50, 57, 60), will be granted. A separate Order will be issued.

Dated: March 26, 2013

United States District Judge